IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JEROME KEE,

              Plaintiff,

    v.

CAMDEN COUNTY, et al.,

              Defendants.

HONORABLE JEROME B. SIMANDLE

Civil No. 04-0842 (JBS)

**OPINION**

APPEARANCES:

Wayne Powell, Esq.
POWELL & BALTIMORE, PC
101 Tarragon Building
811 Church Road
Cherry Hill, NJ 08002
    Attorney for Plaintiff

Deborah Silverman Katz, County Counsel
Donna M. Whiteside, Assistant County Counsel
OFFICE OF CAMDEN COUNTY COUNSEL
520 Market Street, 14th Floor
Camden, NJ 08102-1375
    Attorneys for Defendants County of Camden, the Camden County
    Prosecutor's Office, Lee Solomon, Leslie Dicker, and Thomas
    Hughes-Eddinger

**SIMANDLE**, District Judge:

This matter comes before the Court upon the motion of

Defendants Camden County, the Camden County Prosecutor's Office

and three individual employees of the Camden County Prosecutor's

Office for summary judgment, pursuant to Federal Rule of Civil

Procedure 56. Plaintiff, Jerome Kee, brought this action under

state law (New Jersey's Law Against Discrimination ("NJLAD")) and

42 U.S.C. § 1983[1] alleging disparate treatment and racial discrimination while employed as an investigator with the Camden County Prosecutor's Office.  His complaint alleges that he was subjected to a hostile working environment due to his race, and that he was denied opportunity for promotion to more desirable positions, before being "constructively discharged."[2]  For the reason discussed below, the Court will grant Defendants' motion for summary judgment.

I.   **BACKGROUND**

   A.   **Facts**

   Plaintiff is Jerome Kee ("Plaintiff"), an African American male who, from August, 1993 through December, 2001, was employed at the Camden County Prosecutor's Office as an investigator. (Complaint ¶¶ 1, 7.)  Defendants are the County of Camden (the "County"), the Camden County Prosecutor's Office (the "Prosecutor's Office") and three former or current employees of the Prosecutor's Office: former Camden County Prosecutor Lee Solomon ("Solomon"), Assistant County Prosecutor Leslie Dicker

---

[1] Although Plaintiff's Brief makes various references to Title VII of the Civil Rights Act of 1964, at oral argument, Plaintiff's counsel confirmed that Plaintiff has not brought any claim under Title VII herein.

[2] The Complaint contains a claim for breach of covenant (Count Four) but the parties did not address this issue nor is it mentioned in the Joint Pre-trial Order as either an outstanding or abandoned legal issue.  At oral argument, Plaintiff's counsel voluntarily withdrew this claim.  As such, Plaintiff's breach of covenant claim will be dismissed.

("Dicker") and Chief of Investigations for the Prosecutor's
Office Thomas Hughes-Eddinger ("Hughes-Eddinger").[3]  (Id.  ¶¶ 2-
5.)

### 1.   The Prosecutor's Office's Investigation into Plaintiff

Plaintiff served as an investigator in the Narcotics Unit of
the Prosecutor's Office from approximately 1995 through September
of 2000 when he was transferred to child abuse unit.  (Deposition
Tr. of Jerome Kee at 23-26, Pl.'s Opp. Br. at Ex. 21.)
Defendants concede that, during the majority of his tenure at the
Prosecutor's Office, Plaintiff performed his duties in a
professional, competent and satisfactory manner.  However, in
June of 2000, the Prosecutor's Office commenced an investigation
into Plaintiff.  (Id. ¶ 10.)  The investigation centered on
Defendants' father (Jerome Kee, Sr.) and Jerome Kee, Sr.'s
relationships with certain criminal suspects, namely Ernesto
Padilla (a/k/a Tito) and Padilla's common law wife Sheila
Cabrera.  (Investigative Summary Report of Jerome Kee, Jr., dated
4/24/2001) Def.'s Reply Br. at Ex. A.)  The investigation of
Plaintiff began after the Prosecutor's Office received
information that Plaintiff's father had "tipped off" Padilla
(through conversations with Cabrera) to an ongoing investigation

---

[3] Solomon, Dicker and Hughes-Eddinger shall be referred to
collectively as the "Individual Defendants."  The County, the
Prosecutor's Office, Solomon, Dicker and Hughes-Eddinger shall be
referred to collectively as, the "Defendants."

by the Prosecutor's Office.[4]  Specifically, Padilla stated that, beginning in 1994 and continuing through 1997 and in exchange for payment, Plaintiff's father began giving Cabrera information about the Prosecutor's Office's investigation of Padilla and Padilla's suspected drug activities.  (Id. at 1.)  According to the Summary Investigative Report, Plaintiff denied knowledge of his father's actions but admitted that he told his father that the Prosecutor's Office was conducting "reversals" –– an operation where law enforcement officers pose as drug sellers and arrest would-be buyers –– on a street corner where Padilla was suspected of conducting drug activities.  (Id. at 4.)  Plaintiff also admitted this fact in his deposition.  (Kee Dep. Tr. at 163.)

On April 10, 2001, Plaintiff was interviewed by representatives of the Prosecutor's Office where he refused to answer questions and invoked his Fifth Amendment rights. (Investigative Summary Report at 4.)  On October 18, 2001, while the investigation of Plaintiff still on-going, representatives from the Prosecutor's Office again attempted to interview Plaintiff and inquire about  the relationship between Plaintiff's father and Cabrera.  (Pl.'s Opp. Br. at Ex. 17, 18, 19.) Plaintiff again refused to answer questions or be interviewed by

_____

[4]  According to Defendants, such investigations into the conduct of an investigator were not unusual when an investigator was accused of wrongdoing by a criminal suspect or defendant.

4

members of the Prosecutor's Office.  (Id. at Ex. 17.)

    After the October 18, 2001 meeting with Plaintiff, the
Prosecutor's Office prepared eight separate Notices of
Disciplinary Action, charging Plaintiff with infractions such as:
(1) disclosing confidential information about investigational
activities of the Prosecutor's Office (Ex. 13); (2) failing to
disclose information to his supervisors regarding his father's
relationship with suspected drug dealers and failure to advise
his supervisors that he informed his father of the existence and
location of narcotics investigations in the City of Camden (Ex.
14 and 15); and (3) refusing to be interviewed or answer
questions posed by superiors regarding the Prosecutor's Office's
investigation into these infractions.  (Ex. 16-19.)[5]  Although
Plaintiff was not formally served with these Notices of
Disciplinary Action, he was frequently informed that the charges
were forthcoming, stated that the Prosecutor's Office threatened
him with them, and resigned his position before these charges
were levied.  (Kee Dep. Tr. at 141.)  Defendants state that
Plaintiff was not cleared of the charges, only that Plaintiff
resigned at the conclusion of the investigation and "on the eve

_____

    [5]  The Prosecutor's Office also prepared a Notice of
Disciplinary Action alleging that Plaintiff Kee asked a co-worker
to retrieve certain personal belongings from his office, but that
the co-worker also retrieved certain equipment, work product and
evidence belonging to the Camden County Prosecutor's Office.
(Pl.'s Opp. Br. at Ex. 20.)

5

of formal charges being filed against him." (Def.'s Reply Br. at 1.)

### 2.   **Grand Jury Proceedings Against Jerome Kee, Sr.**

While the Prosecutor's Office was investigating Plaintiff, Plaintiff's father and Plaintiff were subpoenaed to testify before the Grand Jury in New Jersey Superior Court, Camden County. (Compl. ¶ 10.) During the course of the Grand Jury testimony, Defendant Dicker questioned Plaintiff about his eight-year-old employment application to the Prosecutor's Office. (Id.) Plaintiff was never charged with any wrongdoing and no indictment was ever returned in the matter. (Id.)

According to Plaintiff, Defendant Dicker then sought to gain access to a transcript of the Grand Jury testimony. (Id. at 11-12.) Despite a court order denying Dicker access, Plaintiff claims that Dicker obtained a transcript through other channels. (Id. at 11.) Plaintiff alleges that Dicker then began a "frivolous administrative investigation" into Plaintiff that "created an intolerable working environment" for Plaintiff. (Id. at 13.) At the same time, according to Plaintiff, Defendants routinely ignored conduct of white employees that constituted violations of New Jersey state law. (Id.)

### 3.   **The Conclusion of Plaintiff's Employment**

By November of 2001, Plaintiff alleges that the conditions of his employment at the Prosecutor's Office significantly

worsened.  Specifically, Plaintiff states that Defendants caused
Plaintiff's office key card to be deactivated thereby denying
Plaintiff access to the Prosecutor's Office while he was still
actively employed there as an investigator.  (Id. at 14.)
Plaintiff states that he was "systematically and deliberately
harassed because of his race....[and that the actions of
Defendants] were designed to create intolerable working
conditions" for Plaintiff.  (Id. at 19.)  Also in November of
2001, Dicker met with Plaintiff's attorney to discuss on-going
investigation of Kee.  (Cert. of Leslie Dicker ¶ 2.)  Dicker
notified Kee's attorney that the Prosecutor's Office was
preparing disciplinary actions against Kee stemming frm the 2000
investigation.  (Id.)  The parties negotiated, but were unable to
consummate, a separation agreement wherein Plaintiff would be
placed on paid leave as of November 9, 2001 and his resignation
would become effective on January 11, 2002 and, because Plaintiff
would no longer be an employee, the Prosecutor's Office would
have no reason to pursue disciplinary charges against him.  (Id.
at ¶ 6-8.)  On November 21, 2001, Plaintiff tendered his
resignation to Prosecutor Solomon.  (Dicker Cert. ¶ 9, Ex. 3.)

     Although Plaintiff indicated in a letter to Prosecutor
Solomon that he resigned, Plaintiff alleges that he was
constructively discharged by the Prosecutor's Office on or about
December 1, 2001.  (Id.)  Plaintiff claims that the Defendants

"engaged in unlawful employment practices with the purpose and effect of denying Plaintiff . . . equal opportunity for employment" by: (1) maintaining different standards for white employees while denying Plaintiff the opportunity of advancement to higher positions; (2) assigning African American employees to less desirable jobs while systematically promoting white employees to more desirable jobs; and (3) using and manipulating policy directives and guidelines (such as the Office Administrative Guidelines Manual) in such a manner as to discriminatorily discipline Plaintiff. (Compl. 15-16.)  He alleges he was constructively discharged on December 1, 2001. (Id. at 1.)

   B.   **Procedural History**

   Plaintiff originally filed his Complaint in New Jersey Superior Court, Camden County claiming (1) violation of NJLAD (Count I); (2) violation of 42 U.S.C. § 1983 (Count Two); intentional infliction of emotional distress (Count Three); and breach of the implied covenant of good faith and fair dealing (Count Four).  Defendants removed this matter to this Court on February 25, 2004.  For approximately the next 18 months, the Court entered a series of ten scheduling orders extending the time for the parties to conduct discovery.

   At the conclusion of discovery, Defendants filed a motion to dismiss.  In an opinion and order issued on September 28, 2006

8

("September Opinion and Order"), this Court granted Defendants' motion with respect to Plaintiff's claim of intentional infliction of emotional distress against Defendants but denied Defendants' motion to dismiss Plaintiff's claims for violation of the New Jersey Law Against Discrimination ("NJLAD") and violation of 42 U.S.C. § 1983.[6]

On November 3, 2006, Defendants filed a motion for summary judgment and the Court heard oral argument on Defendants' motion on January 16, 2007.  At the conclusion of oral argument, the Court ordered the parties to make supplemental submissions on the issues of (1) the date when the Prosecutor's Office offered for Plaintiff to resign prior to the filing of disciplinary action and (2) the place in Plaintiff's deposition he admits to the facts contained in disciplinary charges brought by the Prosecutor's Office.  Defendants filed their supplemental submissions on January 26, 2007.  Plaintiffs responded on February 6, 2007.[7]

## II.  <u>STANDARD OF REVIEW</u>

---

[6]   In addition, Defendants failed to address Plaintiff's Count Four (breach of implied covenant of good faith and fair dealing), and this Court likewise did not address it in its September Opinion and Order.  As discussed in note 2 <u>supra</u>, at oral argument, Plaintiff's counsel voluntarily withdrew Plaintiff's breach of implied covenant claim.

[7]   The case is scheduled for trial on April 23, 2007. [Docket Item No. 33.]

9

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[8]  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[9]  Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

---

[8] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  See id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  See id.

[9]  The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Country Floors v. Partnership of Gepner and Ford, 930 F.2d 1056, 1061-63 (3d Cir. 1991).

10

III. **DISCUSSION**

   A.   **Preliminary Matters - Procedural Issues Related to Local Civil Rule 56.1**

Before reaching the merits of Defendants' motion and Plaintiff's opposition thereto, the Court must consider a procedural issue.  Both Defendants and Plaintiff failed to submit a statement setting forth material facts as required by Local Civil Rule 56.1 ("Rule 56.1"), which provides that "on a motion for summary judgment, each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue."  L. Civ. R. 56.1.  Although both sides have included in their briefs a statement of facts, neither party has submitted a separate statement specifically identifying the disputed and undisputed material facts as required by Rule 56.1.

A moving party's failure to comply with Rule 56.1 is itself sufficient to deny its motion.  See Bowers v. NCAA, 9 F. Supp.2d 460, 476 (D.N.J. 1998)("This failure to comply with the Local Civil Rule would by itself suffice to deny [defendant's] motion for summary judgment.")  However, some courts in this District have declined to deny such motions on these grounds in instances where there is "no evidence of bad faith on the part of the moving party."  Fowler v. Borough of Westville, 97 F. Supp.2d 602, 606-07 (D.N.J. 2000); see Pinko v. CIA, 312 F. Supp.2d 669, 675 (D.N.J. 2004)(excusing CIA's failure to file statement "since the parties do not dispute the procedural or factual background

11

of this action" and there was no evidence of bad faith.)
Instead, the court can choose to "admonish that the parties
consult the local rules in future cases." Comose v. New Jersey
Transit Rail Operations, Inc., 2000 U.S. Dist. LEXIS 20790
(D.N.J. 2000); see also Leme v. International Total Serve., 56 F.
Supp.2d 472, 477 n.4 (D.N.J. 1999).

Defendants have provided little in the way of support for
their motion for summary judgment and rely on documentary
evidence, the Certification of Leslie Dicker and testimony of
Plaintiff taken during his deposition to support their motion.[10]
Similarly, Plaintiff presents a series of twenty-one disorganized
exhibits in support of his arguments that a genuine issue of fact
does exist.  The Rule 56.1 statements of both sides would have
served to focus the issues and channel the advocacy of each
party.  Such lack of compliance with the Local Civil Rules has
made it difficult and time-consuming for the Court to determine
whether a genuine issue of material fact exists.  Despite this,
the Court, having found no evidence of bad faith, concludes that
both parties were equally lax in their compliance with the Local
Civil Rules, that nearly three years have passed since this case
was removed to this Court (the delay being due in large part to

---

[10]  Such lack of support is particularly surprising on the
part of Defendants as the Court identified the elements that will
be at issue at the summary judgment stage in the Court's Opinion
denying Defendants' motion for dismissal.  Kee v. Camden County,
No. 04-842, 2006 U.S. Dist. LEXIS 73608 (D.N.J. 2006).

dilatoriness of counsel resulting in ten extensions of time for the parties to conduct pretrial discovery), and the Court finding it in the best interest of the parties and justice to adjudicate Defendants' motion for summary judgment without further delay, will not deny Defendants' motion on these procedural grounds and will now address the merits of the case.

   B.   **Plaintiff's Claims under New Jersey Law Against Discrimination**

      1.   **The Parties' Positions**

Defendants argue that Plaintiff cannot maintain a NJLAD claim as Plaintiff has failed to submit any evidence to prove its prima facie case.  Defendants first argue that Plaintiff has failed to come forward with evidence to show that Plaintiff applied for and was qualified for the position for which his employer was seeking applicants.  According to Defendants, Plaintiff has not cited a specific instance where he applied for a promotion for which he was not hired nor has he inquired into the qualifications of any investigator who was promoted during a time that he was also qualified for the promotion.  Second, according to Defendants, Plaintiff has failed to provide evidence that his attempts at promotion were rebuffed despite the fact that he was adequately qualified for the position and has "provided no factual analysis of the actual needs of the [Camden County Prosecutor's Office] or a person-by-person comparison of skills and experience of all of the candidates and the persons

ultimately promoted." (Def.'s Br. at 11.)  As a result of this lack of evidence, Defendants' contend that the Court can make "no meaningful comparison of the candidate for promotion] to determine whether factors other than their qualification, skills and experience" were considered in promotion process.

Plaintiff argues to the contrary, stating he has presented considerable evidence of adverse employment action taken against him including Plaintiff's deposition wherein he claims that, as a result of an allegation made by a criminal suspect that Plaintiff had passed confidential information to the suspect prior to the suspect's arrest, Plaintiff was transferred out of the Prosecutor's Office's narcotics unit.  (Kee Dep. Tr. at 26, Pl.'s Opp. Br. at Ex. 21.)  This transfer, according to Plaintiff, essentially made him ineligible for consideration for a promotion to the position of Senior Investigator.[11]  Plaintiff argues that his treatment by the Prosecutor's Office should be compared with the Prosecutor's Office's treatment of a Caucasian investigator (Peter Sleazier) who had less seniority than Plaintiff but was promoted to Senior Investigator and to other Caucasian investigators who had been accused of wrongdoing but were

_____

[11]  Plaintiff also states that other minority investigators suffered the same fate.  (Kee Depo. Tr. at 29, 30.)  Plaintiff, however, has provided no facts in support of this conclusory statement.

promoted rather than sanctioned (e.g., Greg Bather).[12]  (<u>Id.</u> at 33, 37-41.)

Plaintiff also argues that certain members of the Prosecutor's senior staff (e.g., Senior Investigator Chuck Bentham) repeatedly interrogated Plaintiff as a result of the allegations against him and Caucasian officers were not treated similarly.  (<u>Id.</u> at 58, 59).  For example, according to Plaintiff's deposition, a Caucasian investigator in the narcotics unit (Mark Nichols) "was apparently interviewed only once and never threatened or disciplined according to Nichols' own account" when accused of wrongdoing.  (<u>Id.</u> at 44, 47.)  Finally, Plaintiff contends that, after the commencement of the investigation into whether he passed confidential information, he was also denied a requested transfer to "a desirable position" as an investigator in the homicide division, (Pl.'s Opp. Br. at 10; <u>see</u> <u>also</u> Kee Dep. Tr. at 99-101), and was passed over for a promotion despite the recommendation of Section Chief Donna Spinosa.  (Kee Dep. Tr. at 101-02.)

### 2.  Analysis

NJLAD makes it unlawful "for an employer, because of the race, creed, color, national origin, ancestry, . . . of any

_____

[12]  According to Plaintiff, he was the only member of the Prosecutor's Office staff that was exonerated but "still castigated and marginalized until he was forced from his position."  (Pl.'s Opp. Br. at 9.)

individual . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.J. Stat. Ann. 10:5-12(a).  To establish a prima facie case of race discrimination under the NJLAD, a plaintiff must prove by a preponderance of evidence that he was (1) a member of a protected class; (2) qualified for the position he was seeking; (3) dismissed or not promoted despite being qualified; and (4) accorded less favorable treatment than those persons outside the protected class, which permits an inference of race discrimination.  See Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987); Kee, 2006 U.S. Dist. LEXIS 73608 at *11-12.  Once a plaintiff has satisfied this four part test and has thereby established a prima facie case, the court must conduct a burden-shifting analysis established by the U.S. Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Kee, 2006 U.S. Dist. LEXIS 73608 at *12.[13]

---

[13]    Under this burden-shifting analysis, the plaintiff bears the burden of persuading the trier of fact (by the preponderance of the evidence) that there has been actionable discrimination (satisfying the plaintiff's prima facie case).  If a plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the action at issue.  See Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492 (1982).  If the defendant successfully articulates a legitimate, non-discriminatory reason for the employment action, the plaintiff bears the burden of negating defendant's showing by demonstrating that the proffered reason is a pretext for unlawful discrimination.  See id.  Despite the shift of the burden of production to defendant, the plaintiff bears the burden of persuasion throughout the case. See Texas Dept. of Cmty Affairs v. Burdine, 450 U.S. 248 (1981).

Under the <u>McDonnell Douglas</u> framework, Plaintiff must first prove a prima facie case of discriminations on the promotions, meaning that Plaintiff must prove that (1) he belongs to a protected class, (2) he applied for and was qualified for the promotions, (3) despite his qualifications, he was rejected, and (4) the Defendants ultimately filled the position or continued to seek employees to fill the position he sought.  <u>See</u> <u>Barber v. CBX Distrib. Servs.</u>, 68 F.3d 694, 698 (3d Cir. 1995); <u>Fuentes v. Perski</u>, 32 F.3d 759, 763 (3d Cir. 1994); <u>Jackson v. Chubb Corp.</u>, No. 98-4361, 2001 U.S. Dist. LEXIS 4684 (D.N.J. Mar. 21, 2001).  Here, there is no dispute that Plaintiff, an African American male, is a member of a protected class.  In addition, there is no dispute that Plaintiff was not promoted during the time period upon which his Complaint centers.  Finally, at oral argument counsel for Defendant conceded that Plaintiff expressed interest in being promoted to senior investigator and that Plaintiff's supervisor, Senior Investigator Donna Spinosa, Chief for the Child Abuse Section, recommended Kee for promotion in 2001 and such an oral application and recommendation by a supervisor was in keeping with the tradition at the Prosecutor's Office of the method an employee seeks promotion.  The Court's inquiry then, must focus on whether Plaintiff has come forward with evidence that he was qualified for the promotion to Senior Investigator.

On the one hand, while Plaintiff has submitted a number of

commendations he received and testified that he served in the Prosecutor's Office since 1993, (Kee Dep. Tr. at 132), he has provided no benchmark for this Court to determine whether he was qualified for the position sought (such as educational requirements, seniority, distinguished service, etc.)[14]  In support of his position, Plaintiff provides only anecdotes where he claims Caucasian investigators with less seniority were promoted ahead of him.  While seniority is likely a factor in determining whether an employee is eligible for promotion to senior investigator, it certainly cannot be the only factor and without more, such anecdotes do nothing to demonstrate that Plaintiff himself was qualified for a promotion.  On the other hand, in his deposition testimony, Plaintiff stated that his supervisor, Senior Investigator Spinosa showed him a memo wherein she allegedly recommended Plaintiff for the promotion but that Plaintiff does not have a copy of the memo.  (Kee Dep. Tr. at 101).  This memo may have provided the Court with a summary of Plaintiff's qualifications for the position of senior

---

[14]  Indeed, Plaintiff has conducted very little discovery (despite discovery being extended ten times by Magistrate Judge Ann Marie Donio, see Docket Item No. 15).  Included with his brief in opposition to Defendants' motion, Plaintiff attaches a hodgepodge of 21 exhibits consisting of correspondence between counsel (Exhibit 2), letters of commendation (Exhibits 7-10), numerous disciplinary records (Exhibits 13-20), and a transcript of the deposition of Plaintiff (Exhibit 20).  Plaintiff has not pointed to any evidence (and the Court's review has found none) where Plaintiff demonstrates that he was qualified for the position of Senior Investigator.

investigator, but the memo is not part of the summary judgment record.  Normally, such hearsay about the contents of a writing would be inadmissible and thus not raise a genuine issue of material fact in opposing a summary judgment motion.  Here, however, Defendants' counsel conceded at oral argument that Ms. Spinosa recommended Plaintiff for promotion.  The Court finds that Plaintiff is entitled, as the party opposing summary judgment, to the favorable inference that he was qualified for the position of Senior Investigator.  This flows as an inference from Spinosa's recommendation.  As such, Plaintiff has made out a prima facie case of discriminatory failure to promote and Defendants are called upon to produce evidence of a legitimate, non-discriminatory reason for these decisions.

That Plaintiff has proffered a prima facie case only begins the inquiry.  Under the McDonnell Douglas framework, if Plaintiff establishes a prima facie case, the burden of production shifts to Defendants to articulate a legitimate, non-discriminatory reason for Plaintiff's transfer from the narcotics unit and non-promotion.[15]  Defendants claim that the Prosecutor's Office transferred Plaintiff from the narcotics unit because of the active investigation into whether Plaintiff purposely passed

---

[15]   The defendant's burden is not one of persuasion but only of production of evidence logically supporting a reason for the adverse employment decision.  Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175, 179 (3d Cir. 1985).

19

information to his father regarding an on going narcotics investigation and that Plaintiff was not promoted because of the on-going investigation.  Defendants continue, stating that "[g]iven the seriousness of the accusations against [Plaintiff], the impact of these charges on a major long term drug investigation in Camden County, [Plaintiff] could have expected nothing less than a thorough and somewhat time-consuming investigation."  (Def.'s Reply Br. at 8.)  These are logical, non-discriminatory reasons both for transferring Plaintiff and reserving promotion from investigator to senior investigator. Indeed, one might consider it unreasonable for the Prosecutor's Office to promote an employee -- thereby increasing the employee's responsibility, access and supervisory authority -- who is under investigation for the type of serious infractions that Plaintiff was being investigated for, namely disclosing sensitive and confidential information regarding operations of the Prosecutor's Office.  Thus, the Court finds that defendant has met its burden of production.

Where under the McDonnell Douglas test the defendant proffers a legitimate, non-discriminatory reason for the employment decision, the plaintiff "must point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either (1) disbelieve that employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determining cause of the employer's action." <u>Fuentes</u>, 32 F.3d at 764.

Here, Plaintiff has provided no evidence to allow the fact-finder "reasonably to infer that . . . the employer's proffered non-discriminatory reasons . . . [are] post hoc fabrication or otherwise did not motivate the employment action." <u>Id.</u> Plaintiff could have requested in discovery and presented to the Court a statistical analysis demonstrating that minority investigators were investigated with greater frequency and were given harsher punishments than their Caucasian counterparts. Plaintiff could also have taken the deposition of the individual Defendants themselves and inquired into the motivation for the Prosecutor's Office's investigation into Plaintiff's activities or the Prosecutor's Office transfer of Plaintiff from the narcotics unit. No such evidence, however, is before the Court on this summary judgment record. Rather, Plaintiff has provided nothing more than anecdotal evidence and personal accounts of actions he observed at the Prosecutor's Office. Such anecdotal evidence cannot be said to allow a fact-finder to reasonably infer that the Defendants' proffered non-discriminatory reasons are post hoc fabrications or should be disbelieved.

Contributing to this Court's conclusion that Defendants' stated reasons for not promoting Plaintiff was not a post hoc

fabrication is the seriousness of the charges that were about to be levied against Plaintiff and the ongoing investigation into those charges.  Plaintiff was investigated for disclosing that the Prosecutor's Office was investigating drug trafficking allegations against Tito Padilla to Plaintiff's father, who Plaintiff knew to be in regular contact with Padilla's wife. (Pl.'s Opp. Br. at Ex. 13.)  The Prosecutor's Office was also investigating Plaintiff for actually disclosing to his father the place and time of certain Prosecutor's Office investigations into drug activities in Camden.  (Id. at Ex. 15.)  Thus, Plaintiff was being investigated for serious charges and Plaintiff has failed to present any evidence that any investigator or employee of the Prosecutor's Office was ever promoted while under investigation.[16]  As such, Plaintiff's anecdotes do not tend to show pretext of Defendants reasons for not promoting Plaintiff.

### C.   Plaintiff's Claim under Section 1983

Although the claims alleged in Count Two of Plaintiff's Complaint are not entirely clear, Plaintiff's counsel confirmed at oral argument that Plaintiff brings an action under 42 U.S.C. § 1983 alleging that Defendants Camden County, Solomon, Dicker and Hughes-Eddinger violated his Fourteenth Amendment equal

---

[16]   In fact, at oral argument counsel for Defendants stated that it was the Prosecutor's Office's policy not to promote an employee while that employee was under investigation.

protection rights.  (Compl. ¶¶ 23-24.)   In short, Plaintiff's
allegations refer to Defendants' failure to promote him, an
African American male, while regularly promoting equally or
lesser qualified white males.

### 1.   The Parties' Positions

Defendants argue that Plaintiff has failed to show that
Defendants violated Plaintiff's equal protection rights.
According to Defendants, Plaintiff has not shown that members of
minority groups were promoted in the Camden County Prosecutor's
Office at a different rate than Caucasian males nor has he
presented proof of "discriminatory animus or effect" or that
Plaintiff was treated differently from similarly situated
individuals."  (Id.)[17]  As such, according to Defendants,
Plaintiff has failed to show facts necessary to sustain his
burden of proof on an equal protection claim.  In their reply
brief, Defendants further argue that (1) Plaintiff has presented
no evidence that any of the individual defendants (Dicker,
Solomon and Hughes-Eddinger) failed to promote or give
assignments to Plaintiff or were involved in the decisions to
transfer him out of the narcotics unit and (2) that there is no

---

[17]   In response to this exact argument made in Defendants'
motion to dismiss, the Court, in denying Defendants' motion
stated that should "Defendants file a summary judgment motion,
Plaintiff will be required to come forth with sufficient factual
evidence from which a reasonable jury could find in his favor
under the standard of Rules 56(c) and (e), Fed. R. Civ. P."  Kee,
2006 U.S. Dist. LEXIS 73608 at *18, n. 11.

evidence that the Prosecutor's Office failed to follow any anti-discrimination policy or procedure.

Plaintiff responds by arguing first that all Defendants were involved in discrimination against Plaintiff.[18]  According to Plaintiff, Plaintiff's testimony demonstrates that Defendant Dicker was present when Plaintiff was accosted by Senior Investigator Chuck Bentham, both during his interrogation and immediately preceding the Grand Jury appearance.[19]  As the individual charged with conducting the investigation, Plaintiff was "ultimately [responsible] for creating an environment so unbearable that Plaintiff was forced to leave his position and was constructively terminated."  (Pl.'s Opp. Br. at 23.)  According to Plaintiff, "Defendant Dicker's conduct alone creates a sufficient basis to deny Defendants' motion, but in conjunction with the totality of the circumstances, compels that Defendants' motion be denied.

### 2.  Analysis

---

[18]  Plaintiff argues that, in order to establish the liability of an individual supervisory employee for sexual or racial discrimination or harrassment under 42 U.S.C. § 1983, "there must be some affirmative conduct by the supervisor that played a role in the discrimination." Andrews v. Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990).  In addition, Plaintiff cites that "[t]he necessary degree of personal involvement can be shown in two ways, either 'through allegations of personal direction or of actual knowledge and acquiesce,' or through proof of direct discrimination [or harassment] by the supervisor." Id.

[19]  Plaintiff provides no citation to the record or to Plaintiff's deposition demonstrating this fact.

The Equal Protection Clause of the Fourteenth Amendment
provides that no State shall "deny to any person within its
jurisdiction the equal protection of the laws." U.S. Const.,
Amdt. 14, § 1.  An allegation of racial discrimination in
violation of the Constitution's guarantee of equal protection
cannot survive unless the plaintiff establishes that the
defendant acted with discriminatory intent.  See Washington v.
Davis, 426 U.S. 229, 241 (1976).  To hold an individual defendant
liable under § 1983 for an equal protection violation, a
plaintiff is "required to prove that [the individual defendant]
personally 'participated in violating [plaintiff's] rights, . . .
that [the defendant] directed others to violate them, or that
[defendant] . . . had knowledge of and acquiesced in
[defendant's] subordinates' violations.'" Robinson v. City of
Pittsburgh, 120 F.3d 1286, 1293 (3d Cir. 1997)(quoting Baker v.
Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995)).  A defendant
in a § 1983 action "must have personal involvement in the alleged
wrongs." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.
1988)(emphasis added); Robinson, 120 F.3d at 1294.

Additionally, local governing bodies can be sued directly
under Section 1983 "where . . . the action that is alleged to be
unconstitutional implements or executes a policy statement,
ordinance, regulation, or decision officially adopted and
promulgated by that body's officers." Monell v. New York City

25

Dept. of Social Servs., 436 U.S. 658, 690 (1978).  Thus,
municipal liability attaches only "when execution of a
government's policy or custom, whether made by its lawmakers or
by those whose edicts or acts may fairly be said to represent
official policy, inflicts the injury" the plaintiff complains of.
Id. at 694.  Here then, in order to establish liability on the
part of Camden County and the Prosecutor's Office, Plaintiff must
show that the execution of a government's policy or custom,
whether made by its lawmakers or by those whose edicts or acts
may fairly be said to represent official policy, inflicts the
injury.  See id. at 694.  In the case of either policy or custom,
a plaintiff must show that an official who has the power to make
policy is responsible for either the affirmative proclamation of
a policy or acquiescence in a well-settled custom.  See Bielevicz
v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).

### a.   The Individual Defendants

The Court will grant Defendants' motion for summary judgment
as to Defendants Dicker and Hughes-Eddinger.  Here, Plaintiff has
failed to demonstrate that a genuine issue of material fact
exists regarding whether Dicker and Hughes-Eddinger personally
participated in discriminatory actions against Plaintiff or
directed others to do so.  Moreover, Plaintiff has presented no
evidence that either Dicker or Hughes-Eddinger personally failed
to promote Plaintiff or were involved in the decision to transfer

Plaintiff out of the narcotics unit.  There is also no evidence in the summary judgment record that either Dicker or Hughes-Eddinger were involved in the decision to investigate Plaintiff for passing along confidential information, only that they participated in Plaintiff's investigation.  Plaintiff did not take the deposition of either Dicker or Hughes-Eddinger nor serve them with interrogatories despite being given more than ample opportunity to do so.  Finally, Plaintiff's allegations (made in his brief in opposition to Defendants' motion for summary judgment) that Dicker was present when Plaintiff was allegedly "accosted" by Senior Investigator Chuck Bentham and was "personally aware of the things being done by [Dicker's] subordinates to marginalized Plaintiff . . . and creating an environment so unbearable that Plaintiff was forced to leave his position . . ." are wholly unsupported by the summary judgment record.  Plaintiff fails to cite where in his deposition such an account was given (and the Court can find no such account).  Mere allegations do not suffice.  As such, Plaintiff has failed to demonstrate a "genuine issue" of fact to be decided at trial.

With respect to Prosecutor Solomon, the record is equally lacking regarding any conduct he personally engaged in that resulted in discrimination against Plaintiff.  Plaintiff has failed to direct the Court to any reference in the record describing Prosecutor Solomon's involvement in the investigation

into Plaintiff, any discrimination towards Plaintiff or any action taken by him towards Plaintiff (e.g., directing that Plaintiff be transferred, denying Plaintiff a promotion, etc.). Furthermore, there is no evidence to suggest that Prosecutor Solomon knew or acquiesced in any alleged racial discrimination of Plaintiff.  Thus, with respect to Prosecutor Solomon, again Plaintiff fails to demonstrate that there is a genuine issue of material fact and accordingly, Defendants' motion for summary judgment will be granted and all claims against Prosecutor Solomon dismissed.

### b.    Camden County and the Camden County Prosecutor's Office

The Court finds too that Plaintiff has failed to raise a genuine issue of material fact as to the liability of Camden County or the Prosecutor's Office as he has failed to direct the Court to anything in the record demonstrating that the execution of a County policy or custom (or a policy or custom of the Prosecutor's Office) in any way lead to either Plaintiff's failure to obtain a promotion, his transfer out of the narcotics unit, the Prosecutor's Office's investigation into him or his constructive discharge.  Again, Plaintiff had more than a sufficient amount of time to conduct discovery on this issue and present such evidence (if in existence) to the Court as the Court granted the parties ten extensions of discovery deadlines. Moreover, Plaintiff did not accuse either the County or the

28

Prosecutor's Office of straying from its non-discriminatory policies or contributing in any way to Plaintiffs' alleged discrimination.  As such, summary judgment in favor of Defendants Camden County and the Camden County Prosecutor's Office is appropriate.

IV.   **CONCLUSION**

For the above reasons, Defendants' motion for summary judgment will be granted.  The accompanying Order is entered.


**March 30, 2007**                    **_s/ Jerome B. Simandle_**
Date                                  JEROME B. SIMANDLE
                                      United States District Judge

29